Sandra K. Rolfe, #1305009
CSG, Inc.
714 Fourth Avenue, Suite 200
Fairbanks, AK 99701
(907) 452-1855
(907) 452-8154 fax
sandra@alaskalaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| **CHEMETRIA SPENCER,** § <br> *Plaintiff* § <br> § <br> § <br> VS. § <br> § <br> § <br> **ALYESKA PIPELINE** § <br> **SERVICES COMPANY AND** § <br> **RENIER SWART** § <br> *Defendants* § | | Case No. <br><br> **JURY DEMANDED** |

## COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Chemetria Spencer ("Spencer" or "Plaintiff") presents this Complaint for unlawful discrimination and retaliation. Plaintiff brings this action pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII").

### NATURE OF THE ACTION

1. Plaintiff brings this action against Alyeska Pipeline Services Company ("APSC" or "corporate defendant") and Renier Swart ("Swart") to redress an unlawful pattern and practice of employment discrimination on the basis of race, sex, age, and retaliation for reporting and actively

opposing discrimination in the workplace. These acts and omissions occurred on a continuous basis during the period of 2021 through August 2024, inclusive.

2. Plaintiff is a Black woman; she is over forty (40) years old; and while not always treated as a protected class, plaintiff also is a distinguished United States Army veteran. During the relevant period, Plaintiff was an employee of APSC who was subjected to one or more aspects of systemic discrimination on the basis of her race, sex, and age, including, but not limited to: discriminatory policies, practices, behaviors and procedures; differential treatment; and hostility in the workplace. These behaviors by the corporate defendant, in combination with others, eventually led Plaintiff to resign from her position under duress.

3. After reporting and actively opposing unlawful discrimination in the workplace, Defendants retaliated against Plaintiff by, among other things, initiating at least one workplace investigation against her and eventually forced her to resign her post as a senior manager. This resignation was, in effect, a constructive discharge.

4. Plaintiff seeks declaratory and injunctive relief; back pay; front pay; compensatory, nominal and punitive damages; and attorneys' fees, interest, costs, and expenses to redress Defendants' unlawful conduct.

**PARTIES**

5. Plaintiff resides in Alaska, within this judicial district. Plaintiff was an employee of APSC for about seventeen years and was assigned to work for APSC in Fairbanks, Alaska and elsewhere.

6. Spencer was an experienced and talented Transportation and Facilities Lead for APSC before her separation.

7. Spencer holds three degrees, one of which is a Doctorate in Global Leadership. She also obtained the rank of Captain in the United States Army.

8. APSC is a corporate entity that maintains its principal place of business at 3700 Centerpoint Drive, Anchorage, Alaska 99503. Defendant Swart is a natural person who, on information and belief, currently resides in the State of Alaska. Swart is a white male who was born and raised in the Republic of South Africa during the apartheid era.

## JURISDICTION AND VENUE

9. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331. This is a discrimination action that is authorized and commenced pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

10. Venue is proper in the District of Alaska pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c) because Defendants are subject to personal jurisdiction in Alaska.

11. The District of Alaska is the most logical forum in which to litigate the claims of Plaintiff because APSC's principal office is located in Anchorage, Alaska and it conducts business throughout the state. The individual defendant was, during all relevant times, a ranking employee of the corporate defendant.

## FACTS COMMON TO ALL COUNTS

12. As alleged with greater particularity below, Defendants actively and unlawfully discriminated against Plaintiff on the basis of her race (Black), her gender (female), and her age. Jointly and severally, defendants treated her differently from and less preferably than similarly situated non-Black, male, and younger employees; subjected her to disparate terms and conditions of employment; subjected her on a regular basis to a hostile work environment; subjected her to disparate treatment because of her race, sex, and age; and, eventually, forced her to resign under duress.

13. After reporting and opposing unlawful discrimination in the workplace, Defendants, jointly and severally, retaliated against Plaintiff by, among other things, wrongfully initiating an investigation against her, and forcing her to resign under duress.

14. The discrimination and retaliation described in this Complaint was systemic, and it was continuing in nature throughout the period described above.

15. Defendants unlawfully engaged in a pattern and practice of discrimination and retaliation against Plaintiff.

16. Plaintiff honorably retired from the United States Army as a Captain in 2005. Plaintiff supervised over 270 soldiers at Fort Wainwright in Alaska. She is a strong and capable leader.

17. Plaintiff was initially hired by APSC at its Fairbanks, Alaska facilities in 2007. From that base, she first managed various projects in the field. Thereafter, she was a construction manager who was regularly assigned to work in remote field locations for extended periods.

18. Spencer worked in the forgoing positions until about 2019. She had healthy, indeed favorable,

relationships with her superiors. With the exception of one, all of her supervisors were White people until late 2021.

19. Throughout her employment, Plaintiff received exceptional annual written performance evaluations.

20. During a 2010-2011 company reorganization, it became obvious that an excess percentage of Black workers were separated from the company. A few of the Black workers were assigned to other locations in Alaska. Until these changes, Spencer reported directly to a Black African leader. That relationship was largely harmonious. As a result of these changes, Ms. Spencer became the only Black woman assigned to work at the Fairbanks campus.

21. Beginning in 2021, Swart became Plaintiff's primary supervisor.

22. Swart grew up in a remarkably different culture. That cultural heritage is very different from Plaintiff's roots in the United States.

23. Defendant Swart is a white South African, male. Given his age, he grew up in that country during its apartheid era. He was educated there during that inhumane period, and he later submitted to mandatory conscription. He exceeded his mandatory military obligation and voluntarily remained a member of the South African Air Force for about ten years. He complied with the laws of South Africa that generally required the separation of races, and he embraced these traditions.

24. Defendant Swart had difficulties working with any strong and capable Black woman, including Spencer.

25. APSC did not recognize this risk and take responsible (and timely) steps to minimize conflict based on cultural differences involving Swart and Plaintiff.

26. Defendant Swart was promoted to a manager rank at APSC during about September 2021. Even though he held the same rank as Plaintiff, he became her supervisor. Defendant Swart was given additional duties at that time involving managing and overseeing people.

27. As manager, Defendant Swart assembled an all-White, four-person team. Human Resources ("HR") directed Plaintiff to work under Defendant Swart in about October 2021 as a "Transportation and Facilities Lead."

28. Swart often proclaimed and communicated that he did not want Spencer on his team; he preferred another White man and often publicly expressed that preference. Swart announced that he did not want Spencer to hold a "lead" rank. Defendant Swart's preference was that Plaintiff be demoted in that job to a mere "coordinator" role.

29. Over the years, Swart effectively demoted Spencer by reducing the amount and quality of work that was assigned to her. Swart routinely would take and reassign assignments from Spencer without notifying her.

30. When Spencer noted this pattern, she complained to Swart and announced these observations to HR. Nothing meaningful was done to address these complaints.

31. Plaintiff also noted that work was being redirected from her when she raised issues about the compliance of certain vendors with their contractual obligations. Other members of the team did not experience measurable reductions in their workloads. Between 2021 and 2024, Ms. Spencer's workload was reduced by about eighty percent at the racist direction of Swart.

32. Swart often declared to other members of the team that Spencer was not a team player. Defendant Swart often made comments of this nature in the presence of Spencer. One event is noteworthy. During the 2022 self-evaluation exercise, Swart instructed Plaintiff to rate herself as "Meets." She did not agree with him, and she prepared and submitted forms that rated her performance as exceeding expectations. When Swart noted the "High Meets," he scheduled a meeting with Spencer and he labeled Spencer as someone who did not want to help advance the team.

33. Swart would also criticize Spencer's status as a team player when she raised concerns about certain vendors and their compliance with enforceable contractual obligations.

34. It appeared Swart, a white man, actively looked for opportunities to criticize Spencer, a black woman. He would regularly complain that she closed her office door while working. He would complain that she occasionally laughed or giggled in her office when she was alone. Spencer found Swart's behavior towards her racist, predictable and petty. Swart also would tell Spencer that he did not like her and that he did not want her on his team.

35. As a result of Swart's persistent racist behavior, Spencer made multiple complaints, verbally and written, to HR and the Employee Concern Program ("ECP") about Swart's treatment of her. Spencer estimates that, between 2021 and 2024, she made over fifteen (15) complaints about Swart's behavior. She never received any formal resolution from HR or ECP and often received no response whatsoever.

36. As a result of the lack of meaningful intervention by HR and ECP, Spencer attempted to reach out to several senior corporate managers/supervisors about Swart's mistreatment of her. Again, this did not achieve any resolution.

37. Spencer felt singled out, targeted, and continuously abused by Swart. In fact, when Swart discovered that Spencer was raising concerns about his behavior, Swart retaliated and instructed Spencer that he prohibited her from going to the main building where she would file her complaints.

38. Swart did not treat any White employees the way he mistreated Spencer.

39. Swart would treat younger, female colleagues differently from males. For example, Swart openly described one of his subordinates as his "work wife." He frequently described Grainne Bonestroo, a White woman, in this way. It was apparent to Plaintiff that he treasured the relationship with this White woman and actively looked for ways to advance and protect her. This woman occasionally would suggest, without justification, that she is afraid of Spencer.

40. Spencer later discovered that some of her assignments Swart took from her, he reassigned to Bonestroo to provide her greater visibility to the corporate leadership.

41. On another occasion, during 2023, Defendant Swart asked Spencer if she wanted to sit on his lap. This invitation was unwanted, and it was sexual in nature. Plaintiff reported this to HR/ECP with no known resolution.

42. Plaintiff recalls multiple instances where Swart would come to her office and, while alone with her, demean her and confront her for complaining to HR and ECP. When Spencer raised this confrontational issue with ECP, again she received no resolution and the gross mistreatment by Swart continued without any intervention by the corporate Defendant.

43. Beginning during about February 2024, Spencer began noticing Swart mistreating and making demeaning comments about a Black male contractor. Again, Spencer had never seen Swart speak of a White colleague or contractor in this manner.

44. On or about April 24, 2024, Spencer verbally reported to ECP that she was again convinced that the mistreatment by Swart was because she was a Black woman. Again, Spencer received no resolution or follow-up from HR or ECP regarding this complaint.

45. The following week Spencer was surprised when Swart, without prior announcement, unexpectedly approached her, offered a perfunctory apology, and denied ever mistreating her. In the following weeks, Spencer observed that nothing else changed in Swart's behavior towards her; it remained quite hostile as usual.

46. At this point, Spencer again told HR and management that she did not feel comfortable being alone with Swart. As usual, she received no resolution from HR, nor a formal response.

47. Then, Swart subjected Plaintiff to heightened scrutiny and inappropriate questioning regarding her physical presence at work. On his own, Swart asked the APSC Security team, on June 28, 2024, to conduct an audit of Spencer's physical presence at work during ordinary business hours. A member of the Security team accepted the assignment, and the team examined gate logs at Fairbanks related to Spencer's badge data.

48. Interestingly, the first day of badge logs that Security investigated was the very day in April that Spencer made the verbal complaint to ECP about Swart mistreating her based upon her race and sex. This day probably was on or about April 24, 2024.

49. As a salaried worker, Plaintiff often worked evenings, weekends, and some holidays. Moreover, there is nothing in APSC policies that required salaried workers ever to "badge in" or "clock into" a facility.

50. Amanda Stonecipher, a corporate security worker, conducted the Swart-sponsored investigation. She talked to some people at the facility, and she checked some badge logs. During her probe, some people told Spencer about the inquiries. While this exercise genuinely was not warranted, it was not precise. It did not account for those occasions when Spencer entered through the open warehouse; it did not account for those occasions when Spencer forgot her badge at home; it did not account for times when she entered the building with someone else; and it did not account for the other employees who corroborated Spencer's physical presence in the office. In short, this audit was inept and it was designed solely to undermine and place Spencer at risk.

51. There were further questions about the APSC security investigator's impartiality. Spencer learned that Stonecipher occasionally would refer to her as a "bitch." Obviously, she brought certain biases to her investigation. Months later, this security investigator was dismissed by the corporate defendant because of a series of improper acts and omissions.

52. Armed with the results of this flawed audit, Swart called for a meeting with HR in Anchorage, and this was held on July 25, 2024. At this meeting, Swart and an HR representative, Kathy LaForest, were present.

53. Swart and others accused Spencer of failing to meet her duty to report to work based on the incompetent investigation.

54. In the Anchorage meeting, Swart and others told Spencer to sign a document that admitted the attendance deviations, and they told her that the document would not be part of her permanent personnel record. Defendants also announced repeatedly that they "would be watching[her] in the future."

55. Faced with these threats and being sickened by Swart's ongoing racist behavior, Spencer initially signed the document under duress and handed it to the HR person, Kathy LaForest.

56. At that point there was movement of people from a conference room to other places, and Swart was temporarily alone with Spencer. Swart began harshly questioning Spencer with unrelated accusations about her work. Like a true Afrikaner, Swart then repeatedly told Spencer that she would not be able to work elsewhere in the company, away and free from him.

57. Also, during these events on July 25, 2024, Swart made a statement that evidences his views on differences in the workplace. He told this Black woman, "You just don't fit in. Everybody says so." Coming from a White South African man, that comment staggered Plaintiff and has caused her severe emotional distress.

58. At some point, Plaintiff was alone with the HR person and discussed retirement options. Because retirement was not a viable option, Spencer elected to tender her resignation. This was done under duress, and it certainly was not voluntary. Swart had oppressed Plaintiff so much that she was no longer able to work for APSC – the environment was intolerable. At this point, the disciplinary admission document was shredded in the presence of Plaintiff.

59. Ms. Spencer's resignation was effective August 26, 2024.

60. Swart's conduct was not isolated — it was part of a broader, racially hostile environment where Plaintiff was repeatedly targeted by him and others associated with the corporate defendant because she is Black.

61. Spencer filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC") during or about January 2025.

62. The EEOC has issued a Right to Sue Notice for Spencer to file suit in US District Court.

# CAUSES OF ACTION
## COUNT I
### (Race Discrimination in Violation of Section 1981)

63. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

64. Plaintiff is a Black woman.

65. Plaintiff is over the age of forty (40).

66. Defendants, jointly and severally, have discriminated against her on the basis of her race (as described above) by treating her differently from and less preferably than similarly situated non-Black employees and subjecting her to disparate terms and conditions of employment, hostile work environment, suspension, termination, and other forms of discrimination in violation of Section 1981.

67. Defendants' conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

68. As a proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

69. As a proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## COUNT II
### (Race & Gender Discrimination in Violation of Title VII)

70. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

71. Plaintiff is a member of two protected classes. Plaintiff is Black, and she is a woman.

72. Plaintiff alleges that APSC, in collaboration with Swart, has discriminated against her on the basis of her race and gender (as described above) by treating her differently from and less preferably than similarly situated non-Black, and male employees and subjecting her to disparate terms and conditions of employment, hostile work environment, a forced resignation, and other forms of discrimination in violation of Title VII.

73. APSC's conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff. Swart's acts and omission also were deliberate, racist and sinister, motivated largely because of his cultural heritage and traditions. The corporate defendant tolerated and accepted Swart's misbehavior.

74. As a proximate result of APSC's unlawful discriminatory conduct, in collaboration with Swart, in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

75. As a proximate result of APSC's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## COUNT III
### (Retaliation in Violation of Section 1981)

76. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

77. Plaintiff is a member of a racial minority. Plaintiff is a Black woman, over the age of forty (40).

78. Plaintiff alleges that Defendants retaliated against her for reporting and opposing race discrimination by filing false complaints against her, defaming her, and forcing her resignation (a constructive discharge), formally ending her employment.

79. Defendants' conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

80. As a proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

81. As a proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## COUNT VI
### (Retaliation in Violation of Title VII)

82. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

83. Plaintiff is a member of two protected classes. Plaintiff is a Black person and she is a woman.

84. The corporate defendant retaliated against her for reporting and opposing race discrimination by filing a false complaint against her, defaming her, and forcing her resignation, ending her employment.

85. APSC's conduct was intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

86. As a proximate result of APSC's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

87. As a proximate result of APSC's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally, as follows:

A.   Declare that Defendants' employment policies, practices and/or procedures challenged herein are illegal and in violation of either Title VII and Section 1981.

B.   Issue permanent injunction against Defendants and its (or their) partners, officers, owners, agents, successors, employees, confederates, and representatives and any and all persons acting in concert with them, from engaging in any further unlawful discrimination and retaliation.

C. Order Defendants to make Plaintiff whole by providing appropriate back pay, front pay, lost benefits, and prejudgment interest, in amounts to be determined at trial, and other affirmative relief as the Court finds fair, adequate, and necessary.

D. Order Defendants to make Plaintiff whole by providing compensation for past, present, and future pecuniary losses resulting from the unlawful discriminatory and retaliatory practices described above in amounts to be determined at trial.

E. Order Defendants to make Plaintiff whole by providing compensation for non-pecuniary losses resulting from the unlawful discriminatory and retaliatory practices described above, including emotional pain and suffering, stress, anxiety, depression, loss of enjoyment of life, inconvenience, embarrassment, and humiliation, in amounts to be determined at trial.

F. Order Defendants to pay Plaintiff punitive damages for its (or their) willful and malicious conduct in wanton disregard of Plaintiff's rights as described above, in an amount to be determined at trial.

G. Award reasonable attorney's fees, interest and costs.

H. Grant such other and further relief as the Court deems necessary and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims of relief and issues triable by jury.

Respectfully submitted,

Dated: September 3, 2025

/s/ *Sandra K. Rolfe*
Sandra K. Rolfe
714 Fourth Avenue, Suite 200
Fairbanks, Ak 99701
Phone: (907) 452-1855
Fax: (907) 452-8154
Email: sandra@alaskalaw.com
Attorney Bar #1305009

OF COUNSEL:
Oliver C. Mitchell, Jr.
New York Bar No. 4486460
101 Ellsworth Drive
Sinking Spring, Pennsylvania 19608
Tel. (248) 613-6315
ocmitchelljr@aol.com
(pro hac admission pending)